**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LISMAN MISAEL DE LEON GIRON, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Case No. 20-cv-1977 (GMH)** |
| **ZEYTUNA, INC., et al.,** | |
| **Defendants.** | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This action has a somewhat complicated procedural history that informs the primary issue before the Court:  whether Plaintiffs may pursue wage-and-hour claims against a business they allege is a successor to a restaurant that recently emerged from Chapter 7 bankruptcy proceedings, or whether they are barred from doing so because  the bankruptcy estate "owned" the successor liability claim, which therefore could be brought only by the bankruptcy trustee.  Plaintiffs, who were employed by Defendant Zeytuna, Inc., sued the restaurant and its owner—Defendant Mohammed Hyali—for violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), the D.C. Wage Payment and Collection Act, D.C. Code § 32-1301, *et seq.* ("Wage Payment Act"), and the D.C. Minimum Wage Revision Act, D.C. Code § 32-1001, *et seq.* ("Minimum Wage Act").  While the action was pending, both Defendants filed for bankruptcy protection under Chapter 7 of the Bankruptcy Code.  Because the bankruptcy trustees found there was no property available for distribution, the bankruptcy estates of both Defendants were administered without a distribution to creditors and the cases were closed.  As an individual debtor, Hyali received a discharge pursuant to 11 U.S.C. § 727(a)(1) but Zeytuna, as a business entity, could not.  Thereafter, Hyali was dismissed from this case.  Plaintiffs then sought leave to file an

amended complaint seeking to hold an additional entity—Tazza Café LLC—liable for Zeytuna's alleged violations of the FLSA, the Wage Payment Act, and the Minimum Wage Act as a successor entity to Zeytuna.  For its part, Zeytuna opposed the motion to amend and filed a cross-motion to dismiss the operative complaint.[1]  For the reasons discussed below, Plaintiffs' motion is granted and Zeytuna's motion is denied.

## I.      BACKGROUND

According to the currently operative complaint from July 2020, Hyali owned Zeytuna Inc., an entity incorporated in the District of Columbia that operated a local restaurant known as Zeytuna.  ECF No. 1, ¶¶ 5–6.  Plaintiffs worked at Zeytuna in various capacities until March 2020, when they were laid off.  *Id.*, ¶¶ 7–8.  Plaintiffs allege that they worked dozens of hours of overtime per week but were paid at their regular hourly pay rate rather than the overtime rate required by federal and local law.  *Id.*, ¶¶ 10, 16, 23.  They further allege that they were not paid at all for some of the hours they worked.  *Id.*, ¶¶ 11, 29.

In April 2021, Hyali filed a submission stating that he had filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the District of Maryland.  ECF No. 22.  In May 2021, Zeytuna filed a similar submission regarding its Chapter 7 bankruptcy petition.  ECF No. 28.  The bankruptcy cases automatically stayed proceedings in this action against both Hyali and Zeytuna.  *See* ECF No. 23; Minute Order dated June 1, 2021; *see also* 11 U.S.C. § 362(a); *see, e.g.*, *In re McGuirl*, 349 B.R. 759, 760 (D.D.C. 2006) ("The filing of a bankruptcy petition triggers

---

[1] All current parties have consented to the undersigned's jurisdiction for all purposes.  ECF Nos. 13–14.  The most relevant docket entries for the resolution of these motions are (1) Plaintiffs' motion for leave to file an amended complaint (ECF No. 37); (2) Defendant Zeytuna's motion to dismiss and opposition to Plaintiffs' motion for leave to file an amended complaint (ECF No. 40); (3) Plaintiffs' opposition to Defendant Zeytuna's motion to dismiss and reply in further support of Plaintiffs' motion for leave to file an amended complaint (ECF No. 44); and (5) Defendant Zeytuna's reply in further support of its motion to dismiss (ECF No. 46).  In addition, because Zeytuna's motion to dismiss reply brief was actually an unsanctioned sur-reply to Plaintiffs' motion to amend (*see* ECF No. 48), the Court permitted Plaintiffs to file (6) a sur-sur-reply (ECF No. 49).  The page numbers referred to herein are those assigned by the court's CM/ECF system.

an automatic stay . . . ."); *In re Horton*, 595 B.R. 1, 2 (Bankr. D.D.C. 2019) ("The automatic stay freezes things until the [bankruptcy] court can decide whether cause exists to lift the stay . . . .").

The petitions in both bankruptcy cases listed Plaintiffs as holders of an unsecured nonpriority claim—specifically, a "Fair Labor Standards Act" claim—that was contingent, unliquidated, and disputed. Voluntary Petition for Individuals Filing for Bankruptcy ("Hyali Bankruptcy Petition") at 22–23, *In re Hyali*, No. 21-12451 (Bankr. D. Md. Apr. 14, 2021); Voluntary Petition for Non-Individuals Filing for Bankruptcy ("Zeytuna Bankruptcy Petition") at 15, *In re Zeytuna, Inc.*, No. 21-13607 (Bankr. D. Md. May 28, 2021).[2] Hyali's petition listed as an asset a 100 percent interest in an entity called Tazza Café, LLC, with a value of $0.00. Hyali Bankruptcy Petition at 12, *In re Hyali*, No. 21-12451 (Bankr. D. Md. Apr. 14, 2021). In June and July 2021, the trustee of the bankruptcy estate in each case reported that there was "no property available for distribution from the estate over and above that exempted by law." Chapter 7 Trustee's Report of No Distribution, *In re Hyali*, No. 21-12451 (Bankr. D. Md. June 11, 2021); Chapter 7 Trustee's Report of No Distribution, *In re Zeytuna, Inc.*, No. 21-13607 (Bankr. D. Md. July 12, 2021). The Trustee's Report in Zeytuna's case noted that the company had scheduled claims in the amount of $74,432.10 and that assets in the amount of $5,940.00 were "[a]bandoned." Chapter 7 Trustee's Report of No Distribution, *In re Zeytuna, Inc.*, No. 21-13607 (Bankr. D. Md. July 12, 2021). The final decree of bankruptcy in Zeytuna's Chapter 7 proceedings was entered on July 13, 2021, and the case was closed—without a discharge of pre-petition debts, as mandated

---

[2] The Court takes judicial notice of the filings, orders, and docket of the two bankruptcy cases. *See, e.g.*, *Leramo v. Wells Fargo Bank, N.A.*, No. 1:19-cv-90, 2019 WL 1651268, at *4 (E.D. Cal. Apr. 17, 2019) (taking judicial notice of the filings, orders, and docket of a related bankruptcy case); *Abbey v. Modern Africa One, LLC*, 305 B.R. 594, 605 n.14 (D.D.C. 2004) (taking judicial notice of documents submitted to a bankruptcy court).

by 11 U.S.C. § 727(a)(1), which exempts from discharge any debtor that "is not an individual."[3]
*See* Final Decree, *In re Zeytuna, Inc.*, No. 21-13607 (Bankr. D. Md. July 13, 2021).  Hyali's pre-petition debts were discharged and his case was closed on August 11, 2021.[4]  Order Discharging Debtor, *In re Hyali*, No. 21-12451 (Bankr. D. Md. Aug. 11, 2021); Final Decree, *In re Hyali*, No. 21-12451 (Bankr. D. Md. Aug. 11, 2021).

Initially there was some confusion on the part of Plaintiffs as to the impact of the bankruptcy actions on this one.  Under the mistaken belief that both Defendants had received discharges of their pre-petition debts, Plaintiffs initially asserted that they would dismiss this entire action but then realized their error and sought to dismiss its claims against Hyali, who had received a discharge, and proceed against Zeytuna, which had not.  *See* ECF Nos. 30–32.  Thereafter, the Court dismissed the claims against Hyali, set a briefing schedule for the motions now before the Court, and lifted the stay.  ECF Nos. 35–36, 39.

The proposed amended complaint omits Hyali as a defendant and adds Tazza Café.  ECF No. 37-2 at 3–4.  It includes allegations—discussed in more detail below—that Tazza Café is liable for Zeytuna's debts as a successor entity because Tazza Café engages in a similar business in a similar location under similar ownership and management as Zeytuna and does so with equipment transferred and employees hired from Zeytuna.  *Id.* at 3–5.  The three counts of the proposed amended complaint are the same as those in the currently operative complaint—violations of the

---

[3] A leading treatise explains that "[t]he policy behind th[e] provision [barring business entities from discharge in Chapter 7 cases] is the prevention of trafficking in corporate shells and bankrupt partnerships."  6 *Collier on Bankruptcy* ¶ 727.01 (16th ed.).

[4] The Bankruptcy Code defines a "debt" as a "liability on a claim" and defines "claim" to include even contingent, unliquidated, disputed rights to payment.  11 U.S.C. § 101(5), (12).  In general, a "discharge" under Chapter 7 "discharges the debtor from all debts that arose before the date of the order for relief . . . and any liability on a claim . . . if such claim has arisen before the commencement of the case."  11 U.S.C. § 727(b).

FLSA, the Wage Protection Act, and the Minimum Wage Act. *Id.* at 7–10. However, the counts include an allegation that Tazza Café, as Zeytuna's successor entity, is also liable to Plaintiffs. *Id.*

## II.    LEGAL STANDARDS

"Rule 15(a)(2) [of the Federal Rules of Civil Procedure] instructs district courts to 'freely give leave [to amend a pleading] when justice so requires.'" *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 218 (D.C. Cir. 2010) (second alteration in original) (quoting Fed. R. Civ. P. 15(a)(2)). While "the rule is to be construed liberally," determination of whether to grant or deny leave to amend is firmly within the district court's discretion. *Belizan v. Hershon*, 434 F.3d 579, 582 (D.C. Cir. 2006). More, "[b]ecause amendments are to be liberally granted, the non-movant bears the burden of showing why an amendment should not be allowed." *Abdullah v. Washington*, 530 F. Supp. 2d 112, 115 (D.D.C. 2008). Leave to amend a complaint may be denied where there is "undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies, or futility." *Richardson v. United States*, 193 F.3d 545, 548–49 (D.C. Cir. 1999). Amendment is futile where the allegations in the proposed amended complaint "would not survive a motion to dismiss." *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996). Thus, the "review for futility is functionally 'identical to review of a Rule 12(b)(6) dismissal based on the allegations in the amended complaint.'" *Barry v. Haaland*, No. 19-cv-3380, 2021 WL 5992094, at *1 (D.D.C. July 23, 2021) (quoting *In re Interbank Funding Corp.*, 629 F.3d at 215–16).

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint on the basis that it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A court reviewing a 12(b)(6) motion "must accept as true" the well-pleaded factual allegations contained in the complaint, *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009),

and construe those allegations "in the light most favorable to the plaintiff[ ]," *Vick v. Brennan*, 172 F. Supp. 3d 285, 295 (D.D.C. 2016). While plaintiffs need not make "detailed factual allegations" to avoid dismissal, they must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 555 (2007). Rather, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). To meet this standard, the plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III.   DISCUSSION

As noted, there are dueling motions before the Court. Plaintiffs have filed a motion for leave to file an amended complaint, which seeks to excise the claims against Hyali, retain the claims against Zeytuna, and add claims against Tazza Café on a theory of successor liability. ECF Nos. 37-1, 37-2. Zeytuna opposes the motion for leave to amend, arguing both that it is futile and that it is filed too late. ECF No. 40-1 at 6–10. Zeytuna also moves to dismiss the currently operative complaint. *Id.* at 5–6. Because, as discussed below, the Court grants Plaintiffs' motion to amend their complaint, Zeytuna's motion to dismiss the current complaint is moot and will be addressed only briefly. *See, e.g.*, *Gray v. D.C. Pub. Schs.*, 688 F. Supp. 2d 1, 6 (D.D.C. 2010) ("When a plaintiff amends her complaint, it renders a motion to dismiss that complaint moot. Because the Court is granting Plaintiff's request to amend her Complaint, the court need not reach the substance of Defendants' Motion to Dismiss." (internal citations omitted)).

### A.    Motion to Amend

#### 1.    Futility

Zeytuna develops two arguments that Plaintiffs' proposed amendments are futile.  The first contends that Plaintiffs are not the proper parties to raise the successor liability issue; the second, that Plaintiffs do not plausibly allege that Tazza Café is liable as a successor for Zeytuna's violations of local and federal wage-and-hour law.  Zeytuna also briefly announces a third theory in a paragraph lacking citation to any authority:  that the successor liability claim is not ripe because the Court must first find that Zeytuna is liable to Plaintiffs for the alleged statutory violations before Plaintiffs may raise its successor liability theory.  The sections below address each of those arguments, although in a different order.[5]

##### a.    *Real Party in Interest for the Purposes of an Alter Ego/Successor Liability Theory of Recovery*

Opposing Plaintiffs' motion to amend, Zeytuna argues that, although no claims against it were discharged in bankruptcy, Plaintiffs "lack standing to pursue alter ego/successor liability/veil piercing theories[6] against third parties"—here, Tazza Café—because such theories are "property of the bankruptcy estate" and therefore must be brought, if at all, by the trustee of Zeytuna's (now closed) bankruptcy case.  ECF No. 40-1 at 5–6.

---

[5] In a sentence or two, Zeytuna *suggests* a fourth argument, which seems to be that Plaintiffs are somehow precluded from pursuing a successor liability theory.  ECF No. 40-1 at 6.  That contention is addressed in footnote 12, *infra*.

[6] Technically, "alter-ego" liability and "successor" liability are distinct, although the terms are often used interchangeably.  Successor liability, which is at issue here, comes into play when a plaintiff tries to impose the liabilities of a predecessor corporation on a successor corporation.  *See, e.g.*, *Liberty Mut. Ins. Co. v. Horizon Bus Co.*, No. CV 10-0449, 2011 WL 1131098, at *5–6 (E.D.N.Y. Feb. 22, 2011), *report and recommendation adopted*, 2011 WL 1136270 (E.D.N.Y. Mar. 24, 2011).  "Alter ego" liability is related to veil-piercing, "a legal doctrine by which the corporate form of an entity is disregarded."  2 *Norton Bankr. L. & Prac.* § 21:10 (3d ed.).  Indeed, generally, all are attempts to hold a business entity or individual responsible for the liabilities of a different entity by showing that the two—for example. predecessor and successor, corporation and owner, parent and subsidiary—are, in actuality, the same.  For the purposes of this section—and following the practice of the parties—the Court does not belabor these distinctions, which are not material to this discussion.

i.      Standing vs. Real Party in Interest

First, a note on nomenclature.  Although the parties (and many courts) characterize the question presented as an issue of "standing," it does not, in fact, implicate Article III's jurisdictional requirement that federal courts hear only "actual, ongoing controversies" or "case[s]." *Honig v. Doe*, 484 U.S. 305, 317 (1988); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (noting that the "irreducible constitutional minimum of standing" requires that (1) the plaintiffs have suffered an "injury-in-fact" that is "concrete and particularized" as well as "actual or imminent"; (2) the injury is "fairly . . . trace[able]" to the defendants' challenged actions; and (3) it is "'likely,' as opposed to merely 'speculative'" that the injury will be 'redressed by a favorable decision.'" (alterations in original) (first quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990), then quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 41, 43 (1976))).  Rather, it is a question of "whether, as a *prudential* matter, [Plaintiffs] are proper proponents of the particular legal rights on which they base their suit." *Singleton v. Wulff*, 428 U.S. 106, 112 (1976) (emphasis added); *see also In re Wilton Armetale, Inc.*, 968 F.3d 273, 277 (3d Cir. 2020) ("When a company declares bankruptcy, that declaration does not erase a creditor's constitutional standing to sue. . . .  If [a] company declares bankruptcy, though, . . . creditors may lose the statutory authority to pursue [their] claims."); *Brumfiel v. U.S. Bank*, 618 F. App'x 933, 937 (10th Cir. 2015) (relying on "the prudential standing and real party in interest doctrines" to determine whether the bankruptcy trustee was the proper party to pursue a cause of action); *Koch Refining v. Famers Union Central Exchange, Inc.*, 831 F.2d 1339, 1341 (7th Cir. 1987) (affirming the district court's determination, based on "a prudential aspect of standing," that the plaintiffs "were not the proper proponents" of a claim seeking to impose liability on the alleged alter egos of a corporation in bankruptcy); *cf. Mitchell Food Prods., Inc. v. United States*, 43 F.

App'x 369, 369 (Fed. Cir. 2002) ("[S]tanding and real party in interest are two distinct concepts . . . ."). As a court in the Eastern District of Wisconsin explains:

> "Standing" in this context may be an appropriate shorthand for "prudential standing," which is "a more complex, judge-made concept of standing," encompassing a variety of legal doctrines, including the requirement in Federal Rule of Civil Procedure 17 that the plaintiff be the "real party in interest." It is this principle—"real party in interest"—that is implicated when a debtor attempts to prosecute a claim that belongs to the bankruptcy estate and thus may be prosecuted only by the trustee.

*Bushberger v. Midland Credit Mgmt., Inc.*, No. 17-CV-1468, 2019 WL 2271043, at *3 (E.D. Wis. May 28, 2019) (internal citations omitted) (quoting *Mainstreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 744 (7th Cir. 2007)) (collecting cases); *see also Martineau v. Wier*, 934 F.3d 385, 391 n.3 (4th Cir. 2019) (noting that the question of "a bankruptcy trustee's sole authority to take action on legal claims that belong to the estate" is analyzed "under the real-party-in-interest framework"). A "real-party-in-interest defense . . . is not jurisdictional." *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1080 (11th Cir. 2003) (quoting *Fox v. McGrath*, 152 F.2d 616, 618 (2d Cir. 1945)). Therefore, it is properly analyzed under Rule 12(b)(6). *See, e.g.*, *Arias v. Select Portfolio Servicing, Inc.*, No. 1:17-cv-1130, 2018 WL 1518676, at *3 (E.D. Cal. Mar. 28, 2018) ("Because defendants challenge plaintiff's prudential standing as the real party in interest, rather than her constitutional standing, this motion is properly analyzed under Rule 12(b)(6).").

That affects the parties' burdens of persuasion. Although some courts have said that the question of which party bears the burden of proof in a real-party-in-interest challenge is "unsettled," *Nastasi & Assocss, Inc. v. Bloomberg, L.P.*, No. 18-CV-12361, 2021 WL 3541153, at *4 (S.D.N.Y. Aug. 11, 2021), the better view is that, because an objection to a party's status as the real party in interest is akin to an affirmative defense—non-jurisdictional and waivable—the party who objects has the burden, *see, e.g.*, *Lexington Ins. Co. v. Western Roofing Co.*, No. 03-2036,

2003 WL 22205614, at *1 (D. Kan. Sept. 23, 2003) (citing, among other things, 6A Charles Alan Wright, et al., *Federal Practice & Procedure* § 1554 (3d ed.)); *see also Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 730 (6th Cir. 2016) (noting that a real-party-in-interest challenge is viewed as a waivable affirmative defense); *Nat'l Ass'n of Mfrs. V. Dep't of Labor*, 159 F.3d 597, 604 (D.C. Cir. 1998) (calling the view that the plaintiff has the burden of establishing who is the real party in interest "questionable"). More, "[a] defendant bears the burden to show futility" when opposing a motion to amend. *Mead v. City First Bank of D.C., N.A.*, 256 F.R.D. 6, 7 (D.D.C. 2009). Thus, the Court finds that Zeytuna bears the burden to persuade that Plaintiffs are not the proper parties to pursue their successor liability theory.

ii.     Some Bankruptcy Basics

Turning to the substantive question—that is, whether only the bankruptcy trustee is the real party in interest to pursue Plaintiffs' theory that Tazza Café is responsible as a successor for the violations of wage-and-hour laws allegedly perpetrated by Zeytuna—it is best to begin with some basics of bankruptcy law. The filing of a bankruptcy case "creates an estate" comprising, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1); *see also In re Emoral, Inc.*, 740 F.3d 875, 879 (3rd Cir. 2014). "The property of the estate thus consists of '[w]hatever rights a debtor has in property at the commencement of the case . . . [,] no more, no less." *Foskey v. Plus Props.*, 437 B.R. 1, 9 (D.D.C. 2010) (first alteration in original) (quoting *Moody v. Amoco Oil*, 734 F.2d 1200, 1213 (7th Cir. 1984)).

Most relevant here, "[p]roperty of the estate includes *all* of the debtor's interests in any cause of action that has accrued prior to the bankruptcy petition. . . . Even a cause of action that the debtor, when filing the petition, did not know the law granted belongs to the estate. Property

of the debtor does not escape the bankruptcy estate merely because the debtor is unaware of its existence." *Miller v. Pac. Shore Funding*, 287 B.R. 47, 50 (D. Md. 2002) (internal citations omitted), *aff'd*, 92 F. App'x 933 (4th Cir. 2004); *see also, e.g.*, *Tyler v. DH Cap. Mgmt., Inc.*, 736 F.3d 455, 461 (6th Cir. 2013) ("[E]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541." (alteration in original) (quoting *In re Azbill*, 385 B.R. 799, 2008 WL 647407, at *7 (B.A.P. 6th Cir. 2008)); *accord Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008); *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993), *abrogated on other grounds by Law v. Siegel*, 571 U.S. 415 (2014); *see also In re Porrett*, 564 B.R. 57, 67 (D. Idaho 2016) ("Bankruptcy and appellate courts in and out of the Ninth Circuit agree that property of the bankruptcy estate includes accrued causes of action, even if the debtors were unaware of the claims at the time they filed their bankruptcy petition." (emphasis omitted)).  "Generally speaking, a pre-petition cause of action [in which the debtor has a legal or equitable interest] is the property of the Chapter 7 trustee, and only the trustee in bankruptcy has standing to pursue it." *Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004); *see also, e.g.*, *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 441 (4th Cir. 1999) ("If a cause of action is part of the estate of the bankrupt then the trustee alone has standing to bring that claim."); *In re Truong*, 557 B.R. 326, 342 (Bankr. D.N.J. 2016) ("[A]fter appointment of a trustee, a Chapter 7 debtor no longer has standing to pursue a cause of action which existed at the time the Chapter 7 petition was filed.  Only the trustee, as representative of the estate, has the authority to prosecute and/or settle such causes of action." (alteration in original) (quoting *Cain v. Hyatt*, 101 B.R. 440, 442 (E.D. Pa. 1989))).

To recap:  the bankruptcy estate includes all pre-petition property in which the debtor has a legal or equitable interest, including contingent, disputed, unliquidated legal claims the debtor

may have brought—even ones the debtor does not know about—and the bankruptcy trustee generally is the real party in interest to prosecute a debtor's legal claim that is property of the bankruptcy estate.

iii.     The Relevant "Claim"

The first question to answer, then, is whether Zeytuna "had a legal or equitable interest" in the relevant claim, such that it should be deemed property of the bankruptcy estate that only the bankruptcy trustee may prosecute. 11 U.S.C. § 541(a)(1). But what is the relevant claim here? It would not seem to be any of Plaintiffs' wage-and-hour claims against Zeytuna or Tazza Café. Zeytuna had no "legal or equitable interest" in them. That is, Plaintiffs' wage-and-hour claims are not in any sense Zeytuna's "property"; indeed, Zeytuna is the defendant here, answering to those claims.

Nor does it seem correct to find that Zeytuna has a legal or equitable interest in Plaintiffs' claim that Tazza Café is liable as the alter ego or successor of Zeytuna. First, courts generally find that neither alter ego or successor liability nor piercing the corporate veil is a "claim" in the sense of a cause of action; rather, each is a theory of liability that can be raised in connection with an underlying cause of action.[7] *See, e.g.*, *United States ex rel. Jenkins v. Sanford Cap., LLC*, No. 17-cv-239, 2020 WL 5440551, at *7 (D.D.C. Sept. 10, 2020); *see also, e.g.*, *Deschepper v. Midwest Wine & Spirits, Inc.*, 84 F. Supp. 3d 767, 780 (N.D. Ill. 2015) ("Although the plaintiffs styled successor liability as a claim, it is, in fact, a theory of liability."); *City of Syracuse v. Loomis Armored US, LLC*, 900 F. Supp. 2d 274, 290 (W.D.N.Y. 2012) (collecting cases holding that "'successor liability' is not a separate cause of action but merely a theory for imposing liability on a defendant based on the predecessor's conduct"); *Apace Commc'ns, Ltd. v. Burke*, 522 F. Supp.

---

[7] It is nevertheless the practice of both parties and of many courts to refer to those theories of liability as "claims"— e.g., "alter ego claim," "successor liability claim," and the like.

2d 509, 522 (W.D.N.Y. 2007) ("This claim [for successor liability], however, does not state an independent basis for liability, but depends on the success of plaintiffs' other claims."). How, then, can such a theory of liability constitute property? Moreover, the successor liability theory is raised by Plaintiffs *against* Zeytuna and Tazza Café—again, it does not seem to belong to Zeytuna but to Plaintiffs.

But this intersection of corporate law and bankruptcy law is more snarled than straightforward. A series of cases discussed by the parties holds that certain claims raised by bankruptcy creditors *against* the debtor *can* be property of the bankruptcy estate. *See, e.g.*, ECF No. 40-1 at 5–6 (citing *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132 (4th Cir. 1988)); ECF No. 44 at 5 (citing *In re Emoral* and *Koch Refining*); ECF No. 46 at 4–6 (discussing *In re Emoral* and *Koch Refining*). For example, in *Koch Refining*, the Seventh Circuit noted that claims to recover "property fraudulently or improperly transferred by the debtor before bankruptcy," or "creditor's fraud claims brought under the Racketeer Influenced and Corrupt Organizations Act," or "rights of action against officers, directors and shareholders of a corporation for breaches of fiduciary duties, which can be enforced by either the corporation directly or the shareholders derivatively before bankruptcy," all "become property of the estate which the trustee alone has the right to pursue after the filing of a bankruptcy petition." 831 F.2d at 1343. Claims by creditors alleging that the corporate veil should be pierced or that an alter ego or successor should be held responsible for the liabilities of a corporation can also be considered property of the estate. Broadly stated, the cases addressing veil-piercing or alter ego/successor liability hold that (1) where state law allows a corporation to "pierce its own veil" or bring claims against an alter ego or successor entity[8] and (2) such a veil-piercing, alter ego or successor liability "claim" is "a

---

[8] "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law" unless "some federal interest requires a different result." *Butner v. United States*, 440 U.S. 48, 54 (1979).

general one, with no particularized injury arising from it," that "could be brought by any creditor

of the debtor," then (3) the claim is property of the bankruptcy estate.[9]  *In re Emoral, Inc.*, 740

F.3d at 879, 881 (quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d

Cir. 1989)).

*In re Emoral* is particularly instructive because the court addressed the ownership of a

claim that, like Plaintiffs' claim here, was brought against the debtor and alleged successor

liability.  In that case, the individuals who sought to pursue the successor liability claim (the

"personal injury plaintiffs") alleged that they had been injured by a product manufactured by the

debtor—Emoral, Inc. ("Emoral")—whose assets had been sold to a successor company—Aaroma

Holdings, LLC ("Aaroma")—prior to Emoral entering Chapter 7 bankruptcy proceedings.  *In re

Emoral*, 740 F.3d at 877.  Addressing the prefatory state law question, the court held that under

the law of either potentially relevant state (New York or New Jersey), a corporation could sue a

successor or alter ego for the corporation's own liabilities.  *Id.* at 880–81.  The Third Circuit then

held that the personal injury plaintiffs' successor liability claim was property of the bankruptcy

estate, making a distinction between the personal injury claims against Emoral and the successor

liability allegations against Aaroma:

> To determine whether the [personal injury plaintiffs'] cause of action against
> Aaroma constitutes property of Emoral's bankruptcy estate, we must examine the
> nature of the cause of action itself. While the [personal injury plaintiffs] focus on
> the individualized nature of their personal injury claims against *Emoral,* we cannot
> ignore the fact, and fact it be, that their only theory of liability as against *Aaroma,*
> a third party that is not alleged to have caused any direct injury to the [personal
> injury plaintiffs], is that, as a matter of state law, Aaroma constitutes a "mere
> continuation" of Emoral such that it has also succeeded to all of Emoral's liabilities.

---

[9] Cases have recognized that it is unlikely, outside the context of bankruptcy, that a corporation would raise a theory of alter ego or successor liability against its own alter ego or successor.  *See, e.g.*, *In re Emoral*, 740 F.3d at 881 ("As a practical matter, it is difficult to imagine a factual scenario in which a solvent Emoral, outside of the bankruptcy context, would or could bring a claim for successor liability against Aaroma."); *In re Buildings by Jamie*, 230 B.R. 36, 42 (Bankr. D.N.J. 1998).

*Id.* at 879.  The court stated that the personal injury plaintiffs had not demonstrated "how any of the factual allegations that would establish their cause of action based on successor liability are unique to them as compared to other creditors of Emoral" or "how recovery on their successor liability cause of action would not benefit all creditors of Emoral given that Aaroma, as a mere continuation of Emoral, would succeed to all of Emoral's liabilities."  *Id.* at 880; *see also Koch Refining*, 831 F.2d at 1349 ("A trustee may maintain only a general claim.  His right to bring a claim 'depends on whether the action vests in the trustee as an assignee for the benefit of creditors or, on the other hand, accrues to *specific* creditors.'" (quoting *Cissell v. Am. Home Assurance Co.,* 521 F.2d 790, 793 (6th Cir. 1975))).  The successor liability "claim" was therefore property of the estate and could be pursued only by the bankruptcy trustee, who, in that case, had already entered into a settlement with Aaroma that released it from liability on any cause of action that was property of Emoral's bankruptcy estate.  *In re Emoral*, 740 F.3d at 877, 882.  Accordingly, the Third Circuit prohibited the personal injury plaintiffs from pursuing their successor liability theory against Aaroma (although it left intact any claims they had against Emoral directly).  *See id.* ("Because the [personal injury plaintiffs'] cause of action for successor liability against Aaroma belongs to the bankruptcy estate, it falls within the 'Estate's Released Claims' within the meaning of the Agreement between the Trustee and Aaroma. . . .  We recognize that, in so [holding], we leave the [personal injury plaintiffs], who allege that they have suffered serious personal injuries resulting from exposure to a harmful chemical, albeit not at the hands of Aaroma, with no apparent recourse against Aaroma.  We note, however, that our holding has no bearing on any remedy the [personal injury plaintiffs] may be seeking directly against Emoral in the bankruptcy proceeding . . . .").

Two points bear emphasizing:  (1) the preliminary question of whether a corporation can seek to hold its own successor or alter ego liable for the corporation's own wrong is generally a question of state—here, District of Columbia—law, *see, e.g.*, *In re Emoral*, 740 F.3d at 879–80 (looking to state law); *Koch Refining*, 831 F.2d at 1344–45 (same); *see also Butner*, 440 U.S. at 54 (stating that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law" unless "some federal interest requires a different result"); and (2) if the relevant state law does allow such a claim, to determine whether it is a "general" one, courts focus not on the cause of action underlying the alter ego/successor liability theory, but on that theory itself.  Where the success of that theory would result in increasing the bankruptcy estate, such as by recovering assets transferred or wasted by the debtor or its managers or making a different entity liable for any and all of the debtor's wrongs, it belongs to the estate.  So, in *In re Emoral*, the personal injury plaintiffs' claim, which relied on a theory of successor liability in which Aaroma succeeded to all of Emoral's liabilities, was a "general" claim because, even though those plaintiffs asserted that they had been personally injured by a product made by Emoral, they "fail[ed] to demonstrate how any of the factual allegations that would establish their cause of action based on successor liability [were] unique to them as compared to other creditors of Emoral" and "fail[ed] to demonstrate how recovery on their successor liability cause of action would not benefit all creditors of Emoral given that Aaroma, as a mere continuation of Emoral, would succeed to all of Emoral's liabilities."  740 F.3d at 880.

As to the latter point, Zeytuna argues that is the case here:  because Plaintiffs allege that Tazza Café is really Zeytuna (and vice versa), Plaintiffs' success on that theory would cause Tazza Café to succeed to all of Zeytuna's liabilities—or, put another way, would make Tazza Café's assets available to satisfy any debts of Zeytuna.  ECF No. 46 at 3–5.  While that may be true,

Zeytuna's arguments nevertheless fail right out of the gate because, on the first issue—whether District of Columbia law allows a corporation to sue its own alter ego or successor—it offers no argument. That is, Zeytuna has not established that the relevant "claim" in this case—a successor liability claim that can be brought by the corporation against itself, here Zeytuna against Tazza Café—is cognizable under District of Columbia law. As Plaintiffs point out, the case on which Zeytuna primarily relies in its opposition to the motion to amend, *Steyr-Daimler-Puch*, found a corporation has an equitable interest in the assets of an alter ego *under Virginia law*.[10] ECF No. 44 at 5 n.2; *see also Steyr-Daimler-Puch*, 852 F.2d at 136. The other cases the parties cite do not shed light on that issue either; none address whether a corporation can seek to hold its own successor or alter ego liable under District of Columbia law. *In re Emoral* found that New York and New Jersey law allowed such claims. 740 F.3d at 880–81. *St. Paul Fire & Marine Insurance* found similarly for Ohio law. 884 F.2d at 703. *Koch Refining* did the same for Indiana and Illinois law, 831 F.2d at 1344–45—and, by the way, interpreted Illinois law incorrectly, *see In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d 1015, 1018–20 (Ill. 1994) ("*Koch Refining's* interpretation of Illinois alter ego law . . . is not the law in Illinois."). Like the Supreme Court of Illinois in *In re Rehabilitation of Centaur Insurance*, other courts have found that certain state's laws bar such claims. *See, e.g.*, *In re RCS Engineered Prods., Inc.*, 102 F.3d 223, 226 (6th Cir. 1996) (concluding that Michigan law does not permit a corporation to pierce its own veil); *In re Ozark Rest. Equip. Co.*, 816 F.2d 1222, 1225 (8th Cir. 1987) (same, under Arkansas law); *In re Elegant Homes*, No. CV 06-2574, 2007 WL 1412456, at *3–4 (D. Ariz. May 14, 2007) (stating, "[C]ourts in other states, including Arkansas, North Dakota, Missouri, Michigan, and Maryland, have held that a corporation may not pierce its own veil. These states hold that piercing the

---

[10] To be fair, neither party spends significant time on this preliminary question. Defendants cite a single case on the issue, *Steyr-Daimler-Puch*; Plaintiffs respond in a footnote. However, Zeytuna has the burden of persuasion here.

corporate veil is designed to protect the rights of third party creditors, not the rights of the corporation itself, and that to allow a corporation to pierce its own veil would have the effect of denying the corporation its own corporate existence," and finding that "an Arizona corporation may not pierce its own veil"); *In re Cincom iOutsource, Inc.*, 398 B.R. 223, 231 (Bankr. S.D. Ohio 2008) ("If faced with [the] issue now, we believe that the Ohio Supreme Court . . . would . . . reach the same conclusion under Ohio law that the Sixth Circuit did when interpreting Michigan law on the application of the alter ego doctrine."); *In re Dakota Drilling, Inc.*, 135 B.R. 878, 884 (Bankr. D.N.D. 1991) ("[A]s the Eighth Circuit in *Ozark Restaurant Equip. Co.* . . . . acknowledged, the general law mandates that the piercing of the corporate veil must never be made for the benefit of the corporation or its shareholders.  It is troublesome, in this court's view, to allow a corporation, through its trustee, to pierce its own veil since it would have the effect of denying the corporation of its own corporate existence.  Thus, as the logic of *Ozark* dictates, this court must conclude that the trustee has no standing to pursue the alter ego remedy.").  Unfortunately, the D.C. Court of Appeals has yet to speak definitively on the issue.  It has stated categorically that "a corporation may not pierce its own veil, because to do so 'would have the effect of denying the corporation its own corporate existence'"—but in a case applying Illinois law.  *Flocco v. State Farm Mut. Auto. Ins. Co.*, 752 A.2d 147, 155 (D.C. 2000) (quoting *In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d at 1018).  However, at least one court has found that, under Maryland law—which is persuasive authority where there is "no District [common] law on point," *Conesco Indus., Ltd. v. Conforti & Eisele, Inc.. D.C.*, 627 F.2d 312, 315–16 (D.C. Cir. 1980)—"piercing the corporate veil is essentially a cause of action [brought by parties injured by the corporation] against the corporation and its alter egos" rather than a theory that can be pursued by a corporation against its

own alter ego, *In re Transcolor Corp.*, 296 B.R. 343, 365 (Bankr. D. Md. 2003) (citing *Fuller v. Horvath*, 402 A.2d 134 (Md. Ct. Spec. App. 1979)).

In any case, Zeytuna has failed to present any argument as to whether District of Columbia law would allow Zeytuna to sue its alleged successor under one or both of the theories advanced by Plaintiffs (discussed in more detail in Section III.A.1.c, *infra*)—that Tazza Café is a "mere continuation" of Zeytuna or that there is "substantial continuity" between the operations of Tazza Café and Zeytuna.  ECF No. 44 at 8–12.  Nor has Zeytuna suggested in its briefing that federal law should govern the question as to the FLSA claim because there is an important federal interest at stake, *see Butner*, 440 U.S. at 54, or, if federal law did govern, how that would affect the analysis, *cf. Rule v. S. Indus. Mech. Maint. Co.*, No. 5:16-CV-1408, 2019 WL 2881545, at *8 (W.D. La. July 3, 2019) (asserting that the court was "not persuaded" that an FLSA claim alleging that a successor company was liable for the violations of a bankrupt predecessor company was property of the predecessor's bankruptcy estate in part because of "the distinct nature of employment related claims and the vital policy considerations that permit successor liability as to those claims").  "A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. [The court] will not do his research for him."  *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (alteration in original) (quoting *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990)).  Zeytuna has therefore forfeited the point, which, as discussed above, is necessary to its argument that the successor liability "claim" pressed by Plaintiffs became property of the Chapter 7 trustee.

iv.     The Effect of the Closure of the Bankruptcy Case

More, Zeytuna fails to assess the effect of the fact that its bankruptcy case is closed.  Can a veil-piercing or alter ego/successor liability claim be property of a bankruptcy estate that no longer exists, or pursued by a bankruptcy trustee that has been discharged?  A court in the Southern District of New York has said no.  In *Jackson v. CorporateGear, LLC*, the plaintiff brought a breach of contract claim against a company that then filed a Chapter 7 bankruptcy petition.  No. 04 Civ. 10132, 2005 WL 3527148, at *1 (S.D.N.Y. Dec. 21, 2005).  After the bankruptcy case was closed, the company (which, of course, had not received a discharge, *see* 11 U.S.C. § 727(a)(1)) defaulted and a money judgment was entered in the plaintiff's favor.  *Id.*  Then, the plaintiff filed another action, alleging breach of contract against the two owners of the bankrupt corporation as its alter egos.  *Id.* at *2.  The alleged alter egos moved to dismiss the suit, arguing that the alter ego claim belonged to the bankruptcy estate and could not be pursued by the plaintiff.  *Id.*  The district court disagreed.  It found that, even though under New York law a company can pierce its own veil and thus the claim belonged to the bankruptcy trustee when the bankruptcy proceedings were ongoing, the closure of the Chapter 7 case altered that state of events.  *Id.* at *3–4.  Specifically, the court reasoned that, "[o]nce the bankruptcy proceedings are concluded, there is no longer an estate, and the trustee has been discharged.  Accordingly, the trustee is no longer available to pursue the alter ego claims and there is no longer an estate to benefit from any such suit."  *Id.* at *4; *see also Escobedo v. Ram Shirdi Inc.*, No. 10-cv-6598, 2014 WL 4553186, at *3 (N.D. Ill. Sept. 15, 2014) (rejecting the argument that a Chapter 7 bankruptcy creditor could not bring discrimination claims on an alter ego theory of liability, reasoning that the bankruptcy case had been closed and "there currently is no trustee to bring Plaintiff's alter ego claim"); *cf. Lester v. Percudani*, No. 1:04-CV-0832, 2013 WL 5596019, at *4 (M.D. Pa. Oct. 11, 2013) ("[T]he

dismissal or closure of a bankruptcy case extinguishes the bankruptcy estate.").  , at *4.  More, the court noted that, because a company does not receive a discharge under Chapter 7,

> if a claim against a debtor corporation was not administered in the Chapter 7 proceeding, it survived and can be pursued after the Chapter 7 case is closed.  If the underlying claim against the debtor corporation is not extinguished, there is no logical reason why a creditor should not be able to pursue an alter ego claim against the owner of the corporation.

*Jackson*, 2005 WL 3527148, at *4.  Because "unless and until the bankruptcy case is reopened, there is no estate and no trustee to pursue the [alter ego] claim, . . . [the creditor] is not barred from doing so himself.  The parties revert back to 'a non-bankruptcy context,' and therefore any creditor . . . can invoke piercing to try to satisfy his claim from the [alleged alter ego's] assets." *Jackson*, 2005 WL 3527148, at *5 (quoting *In re Keene Corp.*, 164 B.R. 844, 851 (Bankr. S.D.N.Y. 1994)).

The Seventh Circuit's discussion of the bankruptcy trustee's duties in *Koch Refining* illuminates why it is problematic to hold that only a bankruptcy trustee must (or even can) prosecute a successor liability or alter ego action even after the bankruptcy case has closed:

> [T]he paramount duty of a trustee . . . is the amassing of estate assets for a *pro rata* distribution to all creditors.  There is no conflict of interest in his collecting all property available under state law as a representative of both the debtor and the creditors, for any property brought into the estate will benefit creditors.  The trustee has the additional role of investigating the debtor in his activities and of scrutinizing all parties in close relationship with the debtor for abuses that will harm the creditors.  In this capacity, as well as in his capacity as representative of the general creditors, he can pierce the veil of the debtor corporation harmed by the misconduct of fiduciaries in order to reach the assets of those fiduciaries.
>
> . . . .
>
> [The] trustee's attention is directed to the diligent recovery of the debtor's assets for the benefit of all claimants, and he strives for equality of distribution.

*Koch Refining*, 831 F.2d at 1352–53.  Indeed, it is only because a "general" alter ego claim by definition "inures to the benefit of all creditors" that it *can* be brought by the bankruptcy trustee.

*In re Emoral*, 740 F.3d 879.  That is, the rationale for reserving certain kinds of claims for the bankruptcy trustee is to maximize the assets available to the bankruptcy estate for distribution to creditors.  That rationale evaporates once the estate is closed and the assets have been distributed or, as is the case here, there were insufficient assets to distribute.  As the Seventh Circuit has noted, "whatever happens to [the alleged successor entity] in the [creditor's] pursuit of its claim will have no effect on the bankruptcy proceeding—that is over and done with . . . .  The [plaintiff's] suit . . . 'cannot possibly affect the amount of property available for distribution to [the bankrupt debtor's] creditors; all of [that] property has already been distributed.'"  *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 51 (7th Cir. 1995) (quoting *Zerand-Bernal Grp., Inc. v. Cox*, 23 F.3d 159, 162 (7th Cir. 1994)).

The cases Zeytuna primarily discusses—*Steyr-Daimler-Puch* and *In re Emoral*—do not illuminate the issue of what happens to a live alter ego claim after the bankruptcy case closes because, in each of those cases, the bankruptcy trustee had released the alter ego or successor liability claim while the bankruptcy case was ongoing.  *See In re Emoral*, 740 F.3d at 877 (noting that, during the pendency of bankruptcy proceedings, the bankruptcy trustee had "agreed to release Aaroma"—the bankrupt company Emoral's alleged successor entity—"from 'any causes of action . . . that are property of [Emoral's] estate'" (ellipses in original) (quoting the settlement agreement)); *Steyr-Daimler-Puch*, 852 F.2d at 135 (noting that a claim that an officer and a successor entity were alter egos of a bankrupt company had been "brought, compromised and released" by the bankruptcy trustee during ongoing bankruptcy proceedings).  That is, in those cases the question was whether the trustee owned the alter ego/successor liability claims while the bankruptcy proceedings were ongoing; because they did, the trustee could release the claims, which would, of course, make them unavailable to be pursued outside of the bankruptcy case by a

creditor. *See In re Emoral*, 740 F.3d at 882 ("Because the [personal injury plaintiffs'] cause of action for successor liability against Aaroma belongs to the bankruptcy estate, it falls within the 'Estate's Released Claims' within the meaning of the Agreement between the Trustee and Aaroma. . . ."); *Steyr-Daimler-Puch*, 852 F.2d at 135 ("We conclude that an alter ego claim, under Virginia law, is property of the corporation so that it becomes property of the bankruptcy estate over which the trustee has control pursuant to 11 U.S.C. § 541.  Since the trustee previously compromised that claim with [the alleged alter egos], the district court was correct in dismissing [the creditor's] complaint asserting the [alter ego] claim.").  Indeed, the bankruptcy court for the District of Maryland has characterized *Steyr-Daimler-Puch* as merely "a case of a bankruptcy trustee's suit and settlement with corporate insiders on behalf of the debtor's estate for corporate mismanagement and its preclusive effect of barring a later veil-piercing suit by a creditor."  *In re Transcolor*, 296 B.R. at 365.  Here, there is no suggestion that Zeytuna's bankruptcy trustee released any claims against Tazza Café; thus, the successor liability claim has not become defunct because settled.  And, under the reasoning of *Jackson* and *Koch Refining*, that claim would appear to be available for prosecution by Plaintiffs now that the Zeytuna bankruptcy case is closed.

Indeed, Zeytuna's own arguments establish that, assuming the relevant alter ego claim was part of the bankruptcy estate when its Chapter 7 action was ongoing—a showing it has failed to make—the claim would have reverted to Plaintiffs because, when the bankruptcy case was closed, the trustee would have been deemed to have abandoned the asset.  While the bankruptcy trustee has sole authority to prosecute claims belonging to the bankruptcy estate, "'[a] debtor regains [the right] to bring claims that accrued pre-petition if those claims are abandoned'" by the trustee. *Bejarano v. Bravo! Facility Servs., Inc.*, 251 F. Supp. 3d 27, 31 (D.D.C. 2017) (quoting *Nicholas v. Green Tree Servicing, LLC*, 173 F. Supp. 3d 250, 255 (D. Md. 2016)).  More, a claim abandoned

23

by the trustee that, pre-bankruptcy, could have been brought by someone other than the debtor—for example, by a creditor—"revert[s] back to the prior holder." *In re Wilton Armetale*, 968 F.3d at 284 (alteration in original) (quoting 5 *Collier on Bankruptcy* ¶ 548.02[5][a] (16th ed.)); *see also, e.g.*, *St. Paul Fire & Marine Ins. Co.*, 884 F.2d at 698 ("[A] trustee could choose to abandon a claim, and allow creditors to pursue it independently."); *cf. Jackson*, 2005 WL 3527148, at *5 (holding that an alter ego claim that was not formally abandoned by the Chapter 7 trustee reverted back to the individual who originally brought it against the bankrupt company's owners).

Abandonment is governed by § 554 of the Bankruptcy Code.  A trustee may expressly abandon "any property that is burdensome to the estate or that is of inconsequential value and benefit to the estate" after notice to creditors and a hearing. 11 U.S.C. § 554(a)–(b).  Additionally, certain property is abandoned by operation of law when the bankruptcy case is closed:  "Unless the court orders otherwise, any property scheduled under section 521(a)(1) of [the Bankruptcy Code, which requires a debtor to disclose its assets and liabilities] not otherwise administered at the time of the closing of the bankruptcy case" is deemed "abandoned . . . and administered."  11 U.S.C. § 554(c); *see In re Moreno*, 622 B.R. 903, 911 n.8 (Bankr. C.D. Cal. 2020) (noting that, although § 554(c) "states that an asset reverts back to the 'debtor' at the end of a case," it has been interpreted to mean that closing the bankruptcy case "returns property back to the parties who owned the property immediately prior to the commencement of the case").[11]

---

[11] In a Chapter 7 bankruptcy, an asset is "administered" when it is liquidated and distributed to creditors. *See, e.g.*, *In re Carvalho*, 578 B.R. 1, 7–9 (Bankr. D.D.C. 2017) (discussing the administration of property of the estate where the trustee makes a report of no distribution).  When an asset is "deemed administered" under § 554(c), it is considered administered "for the purposes of [§] 350" of the bankruptcy code, which governs the closing and reopening of bankruptcy cases. 11 U.S.C. §§ 350, 554(c).  That is, when all assets are administered or deemed administered, the bankruptcy case can be closed. *Id.*, § 350.  However, deeming a legal claim administered under § 554(c) does not extinguish it any more than deeming a tangible asset administered somehow liquidates and distributes that property. Rather, as discussed, an asset abandoned and deemed administered reverts back to the entity or entities that owned it before the bankruptcy case.

As noted, Zeytuna disclosed to the bankruptcy court in its Chapter 7 petition the FLSA case brought by Plaintiffs here.  Zeytuna Bankruptcy Petition at 15, *In re Zeytuna, Inc.*, No. 21-13607 (Bankr. D. Md. May 28, 2021).  Zeytuna argues that the trustee deemed its assets "to be of inconsequential value to the Zeytuna estate and not worth administering"—the very language of abandonment.  ECF No. 40-1 at 6; *see also id.* at 11 ("[T]he complete administration of the Zeytuna Bankruptcy Case bars the Plaintiffs[ ] from pursuing" the "alter ego/successor liability claim[.]").  So, under Zeytuna's reasoning, its assets—which include the "alter ego/successor liability claim"—were deemed abandoned pursuant to § 554(c), thereby reverting back to the property's original owners.  That is, if, as Zeytuna insists, the successor liability claim brought by Plaintiffs was property of the estate abandoned by the trustee, it, too, would have reverted back to "the parties who owned the property immediately prior to the commencement of the case," that is, Plaintiffs.[12]

---

[12] In its opening brief, Zeytuna cites Rule 5009(a) of the Federal Rules of Bankruptcy Procedure, which provides that, in cases under Chapters 7, 12, and 13, where the bankruptcy trustee has filed a final report and certified that the case has been fully administered, the United States or a party in interest has 30 days to object, or else "there shall be a presumption that the case was fully administered."  ECF No. 40-1 at 6 (quoting Fed. R. Bankr. P. 5009(a)).  Zeytuna then asserts that because Plaintiffs failed to object to the closing of Zeytuna's bankruptcy case within 30 days of the bankruptcy trustee's Report of No Distribution, "the alleged successor liability claims have been presumptively administered."  *Id.* (citing Fed. R. Bankr. P. 5009(a)).  According to Zeytuna, that "complete administration . . . bars the Plaintiffs[ ] from pursuing [any successor liability] claims."  *Id.* at 11.  In its reply, Zeytuna asserts that the "chapter 7 bankruptcy filing inexorably altered the parties' standing" and repeats that "the complete administration" of the bankruptcy estate "bars" Plaintiffs from pursuing their successor liability claims.  ECF No. 46 at 8.  That is the extent of its argument.  The presentation is so sparse that it is not clear what, precisely, is Zeytuna's point.  But it appears to contend that because Rule 5009(a) would deem the successor liability claim against Tazza Café administered, the claim is buried beyond possibility of exhumation.  That misinterprets the law.  It has long been recognized that Rule 5009(a) is a ministerial rule governing when the Clerk of the Bankruptcy Court may close a bankruptcy case.  *See, e.g.*, *In re Schoenewerk*, 304 B.R. 59, 63 (Bankr. E.D.N.Y. 2003) (asserting that Rule 5009 sets up a "'default rule' that authorizes the Clerk of the Bankruptcy Court to close a case" without requiring the government to "take the additional affirmative act of sending in periodic reports" so that the Clerk "could ascertain whether the United States trustee was fully satisfied with the chapter 7 trustee's administration of the case"); *see also, e.g.*, *In re Potter*, Bankr. Case Nos. 19-60216, et al., 2020 WL 6928782, at *18 (Bankr. S.D. Ill. Oct. 3, 2020) ("Rule 5009 serves the bureaucratic function of eliminating the need for the U.S. Trustee to prepare a report advising the bankruptcy clerk that a case may be closed.").  It does not grant or take away any substantive right.  *See, e.g.*, *In re Schoenewerk*, 304 B.R. at 64.  Indeed, if it worked as Zeytuna asserts it does, it would contravene the clear dictates of § 554(c) of the Bankruptcy Code, which is not permitted.  *See, e.g.*, *id.* ("[T]o the extent that the construction that the debtors' counsel offers for Rule 5009 is inconsistent with the express substantive provisions of section 554, it has long been a fundamental postulate in bankruptcy law that a Federal Rule of Bankruptcy Procedure cannot be construed to trump a substantive provision of the Code . . . ."); *see also* 11 U.S.C. § 2075 (providing that the Federal Rules of Bankruptcy Procedure "shall not abridge, enlarge, or modify any substantive right").

*In re Moreno*, 622 B.R. at 911 n.8.  Therefore—and, again, under Zeytuna's own reasoning—the claim does not now belong to the bankruptcy estate.

To put it another way, Zeytuna insists that any claim asserting that Tazza Café is a successor to Zeytuna and therefore responsible for Zeytuna's debts—including the claim brought in this case by Plaintiffs—belonged to the bankruptcy trustee.  Zeytuna further contends that, when its bankruptcy case was closed, all of its assets—including the claim that Tazza Café is a successor to Zeytuna's debts—were abandoned by the trustee.  Under § 554(c) and the cases interpreting it, upon the closing of a bankruptcy case, abandoned assets—like the claim that Tazza Café is a successor to Zeytuna's debts—revert back to the entity that owned them prior to the bankruptcy proceedings.  Therefore, Zeytuna's argument establishes that the claim that Tazza Café is a successor to Zeytuna's debts has reverted back to Plaintiffs.[13]For these reasons, the Court finds

---

[13] To be sure, there is one situation in which an asset of the bankruptcy estate might be lost and unexploitable even after the bankruptcy case is closed.  Section 554(d) provides that "property of the estate that is not abandoned . . . and that is not administered in the case remains property of the estate."  11 U.S.C. § 554(d).  Under that provision, an asset (including a legal claim) that is not disclosed by the debtor to the trustee—an "unscheduled" asset or claim—"remains property of the estate after the case is closed."  *In re JZ, L.L.C.*, 371 B.R. 412, 418 (B.A.P. 9th Cir. 2007); *see also, e.g.*, *McCain v. District of Columbia*, 206 F. Supp. 3d 576, 582 (D.D.C. 2016) (noting that, under § 554(d), unscheduled property of a Chapter 7 bankruptcy estate that is not liquidated and sold or abandoned remains property of the estate), *aff'd*, No. 16-7123, 2017 WL 2373061 (D.C. Cir. Apr. 11, 2017); *Idearc Media LLC v. Glassman*, Civil Action No. 10-1216, 2011 WL 570017, at *1 (E.D. Pa. Feb. 15, 2011) (noting that § 554(d), "mandates that, at the close of [Chapter 7] bankruptcy proceedings, unscheduled property is 'not abandoned' to the debtor, and thus remains part of the estate").  As property of a bankruptcy estate that is, at best, doctrinally illusory, that property is controlled by neither the debtor nor the trustee; it is inaccessible.  *In re JZ*, 371 B.R. at 418 ("The trustee [in a Chapter 7 case] ceases to serve when the case closes.  Since no Bankruptcy Code provision authorizes . . . [the] debtor to control property of the estate that remains in such status by virtue of § 554(d), the debtor lacks standing, and nobody is left to take the helm.  In short, the chapter 7 estate after closing is a rudderless ship." (internal citation omitted)).  Here, Zeytuna does not argue that disclosure of the FLSA case in its bankruptcy petition was insufficient to give notice to the bankruptcy trustee that the successor liability "claim" was (or might be) property of the bankruptcy estate.  That is, Zeytuna does not argue that the successor liability claim was an "unscheduled" asset (because Zeytuna did not explicitly list it in its bankruptcy petition) or that the claim, as an unscheduled asset, remains cargo of the "rudderless ship" that is the closed bankruptcy estate and therefore unavailable to be pursued by anyone, including Plaintiffs.  Because Zeytuna has not made such an argument, the Court does not address it in any detail.  It is worth noting, however, that such an argument would not necessarily succeed.  *Jackson* held that an alter ego claim brought against a debtor (like the successor liability claim here) that was unscheduled did not remain property of the bankruptcy estate when the case was closed, but rather reverted back to the party who had originally raised the claim against the debtor. 2005 WL 3527148, at *4.  In doing so, the court rather quickly glossed over the rule that unscheduled assets and claims remain property of the estate when the bankruptcy case is closed and therefore cannot be pursued unless the case is reopened, reasoning that, although "the trustee did not formally 'abandon' the alter ego claim[,] . . . unless and until the bankruptcy case is reopened, there is no estate and no trustee to pursue the claim, and thus [the party who

26

that Zeytuna has failed to establish that Plaintiffs are not the real parties in interest with regard to their claim against Tazza Café.

        *b.*     *Ripeness*

Zeytuna also argues that the claims against Tazza Café in the proposed amended complaint would not survive a motion to dismiss because they are not ripe for adjudication.  Specifically, it contends:

> For Tazza to have successor liability, this court must first find Zeytuna liable for the Plaintiffs' claims.  The Amended Complaint does not (and could not) allege that Tazza is directly liable for any FLSA and [Minimum Wage Act] violations because Tazza never employed the Plaintiffs – only Zeytuna did.  If Zeytuna is not liable to the Plaintiffs, then the Plaintiffs have no claims against Tazza. In short, the Plaintiffs' alleged claims against Tazza are not ripe for adjudication.

ECF No. 40-1 at 7–8 (internal citation to the record omitted).

Ripeness doctrine has two facets:  constitutional ripeness, which asks whether a plaintiff has alleged "'an injury-in-fact that is imminent or certainly impending'" such that a federal court may exercise subject-matter jurisdiction over the case; and prudential ripeness, which concerns "'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 59 (D.D.C. 2021) (first quoting *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012), then quoting *Garcia v. Acosta*, 393 F. Supp. 3d 93, 105 (D.D.C. 2019)).  Zeytuna's bare-bones argument does not make clear whether it challenges constitutional ripeness, prudential ripeness, or both.

---

originally brought the claim] is not barred from doing so himself."  *Id.* at *5.  That decision is consistent with the purpose of § 554(d), which is designed to punish a *debtor* for concealing an asset from the trustee by failing to schedule it in the hope that it will be available to the *debtor* after the close of the bankruptcy case.  *See, e.g.*, *Kunica v. St. Jean Fin. Inc.*, 233 B.R. 46, 53 (S.D.N.Y. 1999) ("A debtor may not conceal assets and then, upon termination of the bankruptcy case, utilize the assets for its own benefit."); *see also, e.g.*, *In re Associated Vintage Group, Inc.*, 283 B.R. 549, 566 n.14 (B.A.P. 9th Cir. 2002) (noting that it is "appropriate" to estop a "nondisclosing debtor" from exploiting an unscheduled cause of action for its own benefit after closure of the bankruptcy case).  Here, of course, it is not the debtor that is attempting to exploit the successor liability theory—it is Plaintiffs, who are strangers to the bankruptcy.  Allowing them to pursue the theory, therefore, does not undermine the purpose of § 554(d).

A litigant can waive or forfeit a challenge to prudential ripeness.  *See, e.g.*, *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) (finding a prudential ripeness argument waived); *F.P. Dev. LLC v. Charter Twp. of Canton*, 16 F.4th 198, 203 (6th Cir. 2021) (finding a prudential ripeness argument forfeited); *Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 88–89 (5th Cir. 2011) (noting that a court may deem a prudential ripeness argument waived or forfeited).  The Court finds it has been forfeited here because Zeytuna has failed cite any authority in support of its argument or to address, in any manner, the relevant inquiry.  The Court declines "to do counsel's work."[14]  *Crestek, Inc. & Subsidiaries v. IRS*, 322 F. Supp. 3d 188, 200 n.8 (D.D.C. 2018) (finding an argument raised in a brief without citation to authority forfeited and noting that litigants must not expect "the court to do counsel's work" (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005))).

On the other hand, however tempting it might be to deem an argument directed to constitutional ripeness forfeited for similar reasons, that would be error.  To the extent that

---

[14] In any case, an argument that the successorship dispute would not satisfy the prudential ripeness requirements would likely fail.  As noted, prudential ripeness requires a court to evaluate "the fitness of the issues for judicial consideration and the hardship to the parties of withholding court consideration." *Friends of Animals*, 523 F. Supp. 3d at 59 (quoting *Am. Petroleum Inst.*, 683 F.3d at 386).  The "fitness" prong asks "whether [the court] or the parties would benefit from postponing review until the challenged issue has 'sufficiently "crystallized" by taking on a more definite form.'" *Sys. Council EM-3, Int'l Bhd. of Elec. Workers, AFL-CIO v. AT&T*, 972 F. Supp. 21, 39 (D.D.C. 1997) (quoting *City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1431 (D.C. Cir. 1994)).  Here, the issues are sufficiently definite.  Plaintiffs allege that Tazza Café is liable to them as a successor to Zeytuna.  Although, in order to succeed on that issue, Plaintiffs will have to develop sufficient facts, that is the purpose of discovery.  But resolution of the issue "is not contingent on any future facts," that is, facts that have not yet occurred; rather, "it rests upon [a] legal determination" of whether Tazza Café is liable for any statutory violations of Zeytuna. *Northland Cas. Co. v. Mulroy*, No. CV 13-232, 2014 WL 12649017, at *2 (D. Mont. Aug. 6, 2014) (emphasis omitted); *see also Doe 1 v. Trump*, 275 F. Supp. 3d 167, 205 (D.D.C. 2017) (concluding that a claim was ripe where "the salient facts . . . are not subject to change"), *vacated on other grounds sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019).  Given that conclusion, the Court "need not consider the hardship prong of the ripeness inquiry." *Wellness Pharmacy, Inc. v. Becerra*, No. 20-CV-3082, 2021 WL 4284567, at *14 (D.D.C. Sept. 21, 2021) (citing *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1310 (D.C. Cir. 2010).  But the hardship prong would be met, as well, because "the issues raised in this case about . . . [successor liability] can and should be decided in this proceeding so as to foreclose and/or limit needless future litigation over the same issues." *RSL-3B-IL, Ltd. v. Symetra Life Ins. Co.*, No. CV H-12-2708, 2016 WL 1019509, at *2 (S.D. Tex. Feb. 22, 2016), *report and recommendation adopted*, 2016 WL 1064628 (S.D. Tex. Mar. 14, 2016).

Zeytuna's ripeness argument is a challenge to the Court's jurisdiction, it cannot be forfeited.[15] *See,*

*e.g.*, *Mead v. Holder*, 766 F. Supp. 2d 16, 18 n.1 (D.D.C. 2011).

Constitutional ripeness concerns whether the claim at issue seeks relief for present, existing

injury, or merely requests redress "for future injuries that are hypothetical or speculative."

*Endeley v. U.S. Dep't of Def.*, 268 F. Supp. 3d 166, 175 (D.D.C. 2017). In other words, the

"[r]ipeness doctrine addresses a *timing* question: *when* in time is it appropriate for a court to take

up the asserted claim." *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931,

939–40 (D.C. Cir. 1986). "A claim is not ripe for adjudication if it rests upon 'contingent future

events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*,

523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S.

568, 580–81 (1985)). That said, "if a threatened injury is sufficiently 'imminent' to establish

standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied."

*Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996). In evaluating

standing, the Supreme Court has "not uniformly require[d] plaintiffs to demonstrate that it is

literally certain that the harms they identify will come about. In some instances, [it has] found

standing based on a 'substantial risk' that the harm will occur." *Clapper v. Amnesty Int'l USA*,

568 U.S. 398, 414 n.5 (2013). The Supreme Court has also "found standing based on a 'substantial

---

[15] Because lack of constitutional ripeness is a jurisdictional defect, dismissals on that basis are evaluated under Rule 12(b)(1). Unlike with Rule 12(b)(6), "[i]n 12(b)(1) proceedings, it has been long accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself on authority to entertain the case.'" *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) (quoting *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 362–63 (D.C. Cir. 1982)). That is, when determining its jurisdiction, a court may consider evidence extrinsic to the complaint. Ripeness "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. The facts supporting ripeness—whether found within or beyond the four corners of the complaint—must, when accepted as true, be sufficient "'to state a claim [of ripeness] that is plausible on its face.'" *Abulhawa v. U.S. Dep't of the Treasury*, 239 F. Supp. 3d 24, 31 (D.D.C. 2017) (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)). Here, however, the distinctions between Rules 12(b)(1) and 12(b)(6) are immaterial, because it is unnecessary to go beyond the facts alleged in the proposed amended complaint to decide the legal issue of constitutional ripeness.

risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper*, 568 U.S. at 414 n.5.  However, if a potential injury "relies on a highly attenuated chain of possibilities, [it] does not satisfy the requirements" of Article III.  *Id.* at 410.

The injury here is sufficiently imminent to satisfy the Constitution.  Indeed, the alleged injury has already occurred—it happened when Plaintiffs were allegedly paid for overtime work at their regular rate of pay and allegedly not paid for some work at all.  More, Tazza Café's liability for those alleged wrongs does not "rel[y] on a highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410.  Again, the allegation is that Tazza Café is currently liable to Plaintiffs for those alleged violations.  ECF No. 37-2 at 3–4.  Courts addressing similar circumstances have found successor liability claims constitutionally ripe.  For example, in *Thomeier v. Rhone-Poulenc, Inc.*, the plaintiff was injured while working for a Rhone-Poulenc, Inc. ("RPI").  928 F. Supp. 548, 550 (W.D. Pa. 1996).  He sued a different company—Rhone-Poulenc Specialty Chemicals Company ("Specialty")—for his injuries, apparently believing that a claim against RPI would be barred by the state worker's compensation act.  *Id.*  Later, Specialty merged into RPI.  *Id.*  The plaintiff then sued RPI as the successor to Specialty.  *Id.* at 551.  Addressing RPI's argument that the claim against it was not ripe, the court found that, to the extent that the complaint alleged that RPI was "liable to [the plaintiff] for damages caused by Specialty's negligence because, pursuant to the merger, it has assumed Specialty's liabilities," there was no ripeness issue.  Rather,

> [the plaintiff] alleges that RPI is directly liable to him as a result of the negligence of Specialty.  He further alleges that this liability arises because RPI is the successor-in-interest to Specialty.  If these allegations are proven and no adequate defense demonstrated, they could give [the plaintiff] an immediate right to recover against RPI.  Thus, the Complaint presents a ripe controversy.

*Id.* at 552.  So it is here.  Plaintiffs' proposed amended complaint alleges that Tazza Café is liable to them as the successor to Zeytuna.  ECF No. 37-2 at 3–4.

Similarly, in *Resilient Floor Covering Pension Trust Fund Board of Trustees v. Michael's Floor Covering, Inc.*, the plaintiff, a multi-employer pension plan, claimed that Michael's Floor Covering, Inc. ("Michael's"), as the successor to a defunct entity known as Studer's Floor Covering, Inc. ("Studer's"), was responsible for the ERISA withdrawal liability[16] of Studer's.  No. 16-cv-5200, 2016 WL 5407848, at *1 (N.D. Cal. Sept. 28, 2016), *aff'd*, 707 F. App'x 859 (9th Cir. 2017).  Michael's argued that the successorship question was not constitutionally ripe because the liability of Studer's had not yet been definitively established through the arbitration that ERISA mandates where there is a dispute over withdrawal liability.  *Id.* at *2.  The court framed the question as "whether[,] given that the fact of and amount of Studer's withdrawal liability, although assessed, will be challenged in arbitration, the present dispute between Plaintiffs and Michael's is sufficiently 'immediate' and 'real' to be ripe."  *Id.* at *3.  The court held it was.  It reasoned that adjudicating the successorship question would "determine whether Plaintiffs' quest for withdrawal liability ends with this lawsuit (if Plaintiffs lose) or whether Michael's is a successor to Studer's and therefore currently liable for withdrawal payments pending a final determination in arbitration (if the Court concludes Michael's is a successor)."  *Id.*  The dispute "therefore savor[ed] of 'sufficient immediacy and reality' to warrant resolution."  *Id.* (quoting *Golden v. Cal. Emergency Physicians Med. Grp.*, 782 F.3d 1083, 1088 (9th Cir. 2015)).  Here, Plaintiffs face a comparable situation.  Because Zeytuna is effectively defunct (even as it lives on as a suable entity under D.C. law, as discussed briefly in Section III.B), the successorship question will "determine whether Plaintiffs' quest for [damages for violation of federal and local wage-and-hour laws] ends with

---

[16] Under ERISA, "an employer who withdraws from a multiemployer pension plan must make withdrawal liability payments sufficient to cover that employer's fair share of the plan's unfunded vested liabilities."  *Nat'l Shopmen Pension Fund v. Disa*, 583 F. Supp. 2d 95, 96 (D.D.C. 2008).  "ERISA further provides that '[a]ny dispute between an employer and the plan sponsor . . . shall be resolved through arbitration,' which either or both parties may initiate within specified time periods."  *Id.* at 97 (alterations in original) (quoting 29 U.S.C. § 1401(a)).

this lawsuit (if Plaintiffs lose) or whether [Tazza Café] is a successor to [Zeytuna]" and therefore liable to Plaintiffs for such violations (if proven).  *Id.*  The Court thus finds that the dispute is constitutionally ripe.

*c.*     *Sufficiency of the Allegations*

As noted above, a proposed amendment to a complaint is also futile if it would not withstand a motion to dismiss for failure to state a claim.[17]  Zeytuna contends that the proposed amended complaint does not sufficiently allege that Tazza Café is liable for Zeytuna's debts as a successor.  ECF No. 40-1 at 8–10.  To survive this futility challenge, the proposed amended complaint "must contain sufficient factual matter, accepted as true," to "allow[ ] the court to draw the reasonable inference that [Tazza Café] is liable [as a successor] for the misconduct alleged [to have been committed by Zeytuna]."  *Iqbal*, 556 U.S. at 678.  Plaintiffs argue primarily that Tazza Café is liable as a successor because it is not a fully separate entity, but rather a continuation of Zeytuna.  ECF No. 37-2 at 3–5; ECF No. 44 at 8–12.

Under District of Columbia law, a business entity acquiring some or all of the assets of another business does not take on the predecessor's debts or liabilities unless one of four exceptions applies:

(1)     the successor "expressly or impliedly agrees to assume such debts";

---

[17] Although successor liability is a theory of liability rather than a claim or cause of action, *see* Section II.A.1.a, *supra*, a Rule 12(b)(6) motion may also challenge the factual bases supporting such a theory.  *See Deschepper*, 84 F. Supp. 3d at 780 ("Although the plaintiffs styled successor liability as a claim, it is, in fact, a theory of liability. . . . Nevertheless, a defendant may file a Rule 12(b)(6) motion directed at allegations supporting a theory of liability." (citing, among other cases, *Chi. Truck Drivers*, 59 F.3d at 49)).  In support of its argument that Plaintiffs cannot show that Tazza Café is Zeytuna's successor, Zeytuna has submitted extrinsic evidence in the form of an affidavit from Hyali.  ECF No. 40-2.  But a court applying the standards of Rule 12(b)(6) must assume the truth of the complaint's factual allegations and rely only on those allegations and facts of which the court may take judicial notice.  *SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 83 (D.D.C. 2014); *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).  Accordingly, the Court will not consider the Hyali affidavit in deciding whether Plaintiffs have alleged sufficient facts at this stage to plausibly allege that Tazza Café may be held liable for Zeytuna's liabilities.  *See, e.g.*, *e-Smart Techs.*, 31 F. Supp. 3d at 83 ("[A]s the Court must rely *solely* on matters within the pleadings at this stage, it cannot consider any of Defendants' extrinsic evidence." (internal citation omitted)).

(2)    "the transaction amounts to a de facto merger" of successor and predecessor;

(3)    the successor is a "mere continuation" of the predecessor; or

(4)    "the transaction is entered into fraudulently in order to escape liability for such debts."

*Bingham v. Goldberg. Marchesano. Kohlman. Inc.*, 637 A.2d 81, 89–90 (D.C.1994) (quoting *Bud Antle, Inc. v. E. Foods, Inc.*, 758 F.2d 1451, 1456 (11th Cir. 1985)). "Courts have held that the 'de facto merger' exception and the 'mere continuation' exception are 'so similar that they may be considered a single exception.'" *Xue Ming Wang v. Abumi Sushi*, 262 F. Supp. 3d 81, 87 (S.D.N.Y. 2017) (quoting *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 n.3 (2d Cir. 2003)); *see also Xie v. Sklover & Co.*, 260 F. Supp. 3d 30, 49 (D.D.C. 2017) (noting that "the *de facto* merger and mere continuation 'exceptions are quite similar'" (quoting *Beach TV Props., Inc. v. Solomon*, No. 15-cv-1823, 2016 WL 6068806, at *11 (D.D.C. Oct. 14, 2016))); *Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, 62 F. Supp. 2d 13, 23 (D.D.C. 1999) (considering the second and third exceptions together).

The meat of the matter under either exception is whether Tazza Café should be held to Zeytuna's liabilities because the two entities are effectively the same company. Under District of Columbia law, "the test is whether there is a continuity of the corporate entity" of the predecessor, not merely whether "there is a continuation of the [predecessor's] business operation." *Bingham*, 637 A.2d at 92 (quoting *Bud Antle*, 758 F.2d at 1458). To determine that question, courts consider whether (1) the owners of the predecessor and the successor companies are the same, (2) assets were transferred from the predecessor to the successor for sufficient consideration, (3) the predecessor failed to meet its contractual obligations, and (4) the predecessor continued its own

business operation.  *See Sodexo Operations, LLC v. Not-For-Profit Hosp. Corp.*, 264 F. Supp. 3d 262, 268 (D.D.C. 2017).

There is another test, however, that courts have used to determine successor liability under certain federal statutes:  "Federal courts have developed a federal common law successorship doctrine which now extends to almost every employment law statute."  *Steinbach v. Hubbard*, 51 F.3d 843, 845 (9th Cir. 1995).  This "substantial continuity" test "is more favorable to plaintiffs than most state-law standards to which the court might otherwise look."  *Teed v. Thomas & Betts Power Sols.*, *LLC*, 711 F.3d 763, 764 (7th Cir. 2013).  That test asks (1) whether the alleged successor had notice of the potential liability; (2) whether the predecessor had the ability to provide relief; and (3) whether there has been a substantial continuity of business operations, examining such factors as (a) whether the alleged successor uses the same location as the predecessor, (b) whether it uses substantially the same workforce and supervisory personnel (c) whether it uses the same equipment and method of production, (d) whether it provides the same service or products, and (e) whether the same jobs exist under similar working conditions.  *See, e.g.*, *Bd. of Trs. of Unite Here Local 25 v. MR Watergate LLC*, 677 F. Supp. 2d 229, 232 (D.D.C. 2010).  Although the D.C. Circuit has not applied the federal common law substantial continuity test outside the labor law context in which it was developed, *see, e.g.*, *Sec'y of Labor, Mine Safety & Health Admin ex rel. Keene v. Mullins*, 888 F.2d 1448, 1453–54 (D.C. Cir. 1989) (noting that those factors are relevant to the determination of successor liability in "a labor context" (quoting  *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir. 1974))), a number of other Circuits have done so where a plaintiff seeks to impose successor liability in a case under the FLSA.  *See, e.g.*, *Hatfield v. A+ Nursetemps, Inc.*, 651 F. App'x 901, 906–07 (11th Cir. 2016); *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 151–52 (3d Cir. 2014); *Teed*, 711 F.3d at

766–67; *Steinbach*, 51 F.3d at 845–46.  The D.C. Circuit has recognized that fact in dicta:  "In the context of federal statutes whose primary beneficiaries are employees, [ ] it appears that most courts invoke the substantial continuity test."  *Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 825 (D.C. Cir. 2001).

At this point, the Court need not decide whether the substantial continuity test applies to Plaintiffs' claims under the FLSA,[18] because Plaintiffs have sufficiently alleged successor liability under both tests.  At this stage of the proceedings, "a plaintiff need only 'suggest a plausible scenario to show that the pleader is entitled to relief,'" even where "'it strikes a savvy judge that . . . recovery is very remote and unlikely.'"  *Sodexo Operations*, 264 F. Supp. 3d at 267 (alteration in original) (quoting *Atherton*, 567 F.3d at 681).  To plausibly assert the "mere continuation" theory under District of Columbia law, Plaintiffs must plead facts that would support a finding that Tazza Café is a continuation of the corporate entity known as Zeytuna by looking at factors such as (1) the ownership of Tazza Café and Zeytuna, (2) any transfer of assets from Zeytuna to Tazza Café, (3) whether Zeytuna failed to meet its legal obligations, and (4) whether Zeytuna ceased operating.  *See, e.g.*, *id.* at 268.  They have done so.  Plaintiffs allege, and Zeytuna concedes, that Tazza Café is owned by Hyali, who also owned Zeytuna; that Zeytuna was unable to meet its contractual obligations; and that Zeytuna is no longer a going concern.  ECF No. 37-2 at 3–5; ECF No. 40-1 at 6, 9.  Plaintiffs also allege that Zeytuna transferred assets to Tazza Café,

---

[18] Plaintiffs contend that the substantial continuity test should also be applied to its claims under the Minimum Wage Act and the Wage Protection Act, which are not, of course, federal statutes.  ECF No. 44 at 9.  They do not explain why this should be except to note that District of Columbia "wage laws are construed consistently with the FLSA."  *Id.* (citing *Hernandez v. Stringer*, 210 F. Supp. 3d 54, 60 n.2 (D.D.C. 2016)).  But the successor liability question does not derive from the FLSA; it is a creature of District of Columbia common law.  *See, e.g.*, *Direct Supply, Inc. v. Specialty Hosps. of Am., LLC*, 878 F. Supp. 2d 13, 20 (D.D.C. 2012) (noting that the mere continuation exception is a rule of District of Columbia common law).  Plaintiffs provide no support for the contention that the Court should apply federal common law to determine successor liability on a claim based in District of Columbia law and authority indicates the contrary.  *See, e.g.*, *Teed*, 711 F.3d at 764 (noting that state common law applies to the question of successor liability if the wage-and-hour claim is based on state law).

which are now used by Tazza Café to engage in the same business as did Zeytuna from a similar location with some of the same employees.  ECF No. 37-2 at 3–5.  That is sufficient to withstand a motion to dismiss under the "mere continuation" theory.  *See, e.g.*, *Sodexo Operations*, 264 F. Supp. 3d at 269–70 (finding a "mere continuation" theory sufficiently pleaded where the complaint included allegations that the predecessor and successor entities shared ownership and engaged in the same business in the same area).

The proposed amended complaint also includes allegations sufficient to support successor liability under the federal common law "substantial continuity" test.  In addition to considering factors like those noted above, which are useful to determine whether the successor continued the business operation of the predecessor (even if it did not continue the corporate existence of the predecessor), courts have found "indispensable" two additional factors:  notice to the successor of the predecessor's legal obligation and an inability of the predecessor to provide relief to the claimant.[19]  *Xue Ming Wang*, 262 F. Supp. 3d at 89.  The proposed amended complaint meets that bar as well.  It avers that Hyali is the owner and operator of Tazza Café, as he was of Zeytuna; that Tazza Café "through Hyali, was on notice of Plaintiffs' claims against Zeytuna for its violations of the wage and hour laws"; and that "Zeytuna is unable to provide adequate relief to Plaintiffs . . . because it is no longer a viable business concern."[20]  ECF No. 37-2 at 3.  That, in tandem with the allegations noted above, is sufficient at this stage to plausibly suggest that

---

[19] The Seventh Circuit has explained the rationale underlying these factors "indispensable" factors:  "it would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent [successor] when the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself from the potential liability contractually."  *Musikiwanba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985).

[20] The Court recognizes that Zeytuna challenges many of the facts Plaintiffs have alleged.  *See generally* ECF No. 40-1 at 8–10; ECF No. 40-2.  However, "'[i]n assessing a motion for leave to amend, the Court is required to assume the truth of the allegations in the proposed amended complaint and construe them in the light most favorable to the movant.'"  *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 57 (D.D.C. 2019) (alteration in original) (quoting *Flaherty v. Pritzker*, 322 F.R.D. 44, 46 (D.D.C. 2017)).

Plaintiffs are entitled to relief from Tazza Café under the substantial continuity test, even if later discovery uncovers facts making recovery unlikely.[21]  *See Sodexo Operations*, 264 F. Supp. 3d at 267.

       2.     Delay

Zeytuna argues that Plaintiff unduly delayed by filing the motion to amend at the end of November 2021, more than eleven months after the January 5, 2021 deadline for amendment of claims set in the Court's Scheduling Order.  ECF No. 40-1 at 7.  In their arguments for and against amendment, both parties cite the "undue delay" phrasing from cases interpreting Rule 15(a).  *See* ECF No. 37 at 2; ECF No. 40-1 at 7; ECF No. 44 at 6–7.  However, courts in this Circuit have made clear that, while "[m]otions to amend pleadings filed within the time set by a scheduling order are subject to review under the standard of Rule 15, which instructs that the 'court should freely give leave when justice so requires,'" motions to amend "filed after a scheduling order deadline has passed are subject to the more stringent 'good cause' standard of Rule 16(b)(4) for modification of a scheduling order."  *Brooks v. Clinton*, 841 F. Supp. 2d 287, 296 (D.D.C. 2012) (quoting Fed. R. Civ. P. 15(a)(2)); *accord Valle v. Karagounis*, No. 1:19-CV-03764, 2020 WL 5505299, at *2 (D.D.C. Sept. 11, 2020); *Lovely-Coley v. District of Columbia*, 255 F. Supp. 3d 1, 5 (D.D.C. 2017); *Wallace v. AlliedBarton Sec. Servs., LLC*, 309 F.R.D. 49, 50 (D.D.C. 2015). "Under Rule 16(b), the determination of whether 'good cause' exists turns on the moving party's diligence."  *Lovey-Coley*, 255 F. Supp. 3d at 6.  A court should also inquire as to whether the non-moving party will be prejudiced.  *See id.* at *7; *see also Valle*, 2020 WL 5505299, at *2 ("Prejudice

---

[21] Because Plaintiffs sufficiently allege successor liability on the grounds that Tazza Café is a continuation of Zeytuna, the Court does not address Plaintiffs' alternative argument that Tazza Café was formed "for a fraudulent purpose, namely to enable Zeytuna to avoid liability" for the violations alleged in this case.  ECF No. 37-2 at 4; *see also* ECF No. 37 at 5; ECF No. 44 at 11.  However, the Court notes that the allegations supporting that theory are threadbare and appear to be based exclusively on the timing of Tazza Café's formation, which has been held insufficient in other cases.  *See Xie*, 260 F. Supp. 3d at 49 (finding that the mere timing of an entity's formation was not sufficient to plausibly allege that the entity was formed for a fraudulent purpose to escape liability).

to the opposing party remains relevant but is not the dominant criterion.  Indifference by the moving party seals off this avenue of relief irrespective of prejudice because such conduct is incompatible with the showing of diligence necessary to establish good cause." (quoting *O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 155 (1st Cir. 2004))).  Not only is the Rule 16 good cause standard more stringent than the undue delay standard under Rule 15, it also shifts the burden of persuasion from the party opposing amendment to the party seeking amendment.  *See, e.g.*, *Valle*, 2020 WL 5505299, at *2 n.1 ("Plaintiffs incorrectly argue that 'Defendants bear the burden of demonstrating why leave for Plaintiffs[ ] to file their Amended Complaint[ ] should not be granted.' . . .  Under Rule 16, the burden is on Plaintiffs to show good cause for their failure to amend before the deadline." (first two alterations in original) (citations omitted) (quoting the record)).

Nevertheless, the Court has little trouble finding that Plaintiffs meet even the more demanding "good cause" standard.  A review of the procedural history of this case will be useful here.  On November 10, 2020, the Court entered its scheduling order, which included a January 5, 2021 deadline for amendment of pleadings and a discovery deadline of May 3, 2021.  ECF No. 15.  By mid-February 2021, written discovery was still ongoing, depositions had only just begun, and the parties sought an extension of the discovery deadline until early July 2021, which the Court granted.  ECF No. 17 at 3–5, 6; ECF No. 18 at 1 (asserting that Defendants did not object to an extension of the discovery deadline but did object to extension of other deadlines); ECF No. 19.  Approximately one month later, Defendants' attorney sought to withdraw, a request the Court granted on March 22, 2021, leaving Defendants without counsel.  ECF Nos. 20–21.  On April 14, 2021, Hyali filed his bankruptcy petition, staying the case as to him.  ECF No. 22.  On May 28, 2021, Zeytuna filed its bankruptcy petition, staying the case in its entirety.  ECF No. 28.  In June,

the Court noted the stay and ordered the parties to file a report on the status of the bankruptcy cases by October 11, 2021.  Minute Order dated June 1, 2021.  Zeytuna's bankruptcy case was closed in mid-July 2021; Hyali's bankruptcy case closed in mid-August 2021.  Final Decree, *In re Zeytuna, Inc.*, No. 21-13607 (Bankr. D. Md. July 13, 2021); Order Discharging Debtor, *In re Hyali*, No. 21-12451 (Bankr. D. Md. Aug. 11, 2021); Final Decree, *In re Hyali*, No. 21-12451 (Bankr. D. Md. Aug. 11, 2021).

In mid-October, in compliance with the Court's order, Plaintiffs informed the Court that the bankruptcy cases had been closed and requested that the case continue to be stayed pending dismissal of the claims against Hyali.[22]  ECF Nos. 30–31.  In short order, Plaintiffs filed a motion to dismiss their claims against Hyali and the Court scheduled a status conference to discuss that motion and to determine how the case would proceed.  ECF No. 32; Minute Order dated Oct. 28, 2021.  After the status conference on November 15, 2021, the Court entered two orders:  one dismissing Hyali, the other setting the schedule—to which the parties agreed—for the two motions currently before it.  ECF No. 36.  The Court officially lifted the stay in this case on December 6, 2021.  ECF No. 39.

Based on that record, the delay at issue should not be measured as the eleven months between the early January deadline for amendments to the pleadings and the date that the motion to amend was filed at the end of November 2021.  Defendants were without counsel beginning in mid-March; proceedings against Hyali were stayed in April; all proceedings were stayed in May; and that stay was effectively continued until at least mid-October, when Plaintiffs moved to

---

[22] As noted above, Plaintiffs originally planned to dismiss the case in its entirety (ECF No. 30), but upon realizing that Zeytuna had not received a discharge, amended that plan to dismiss only Hyali and to proceed against Zeytuna and its alleged successor (ECF No. 31).

dismiss the claims against Hyali.  The stay was finally lifted by the Court in December.[23]  It would be inappropriate to blame Plaintiffs for failing to file a motion to amend in the many months while the case was effectively stayed pending the bankruptcy proceedings.  More, Plaintiffs assert that they learned of the existence of Tazza Café only after Hyali filed his bankruptcy petition, which listed Tazza Café as an asset, on April 14, 2021.  ECF No. 44 at 6; *see also* Hyali Bankruptcy Petition at 12, *In re Hyali*, No. 21-12451 (Bankr. D. Md. Apr. 14, 2021).  Thereafter, within one week of informing the Court of the closure of both Zeytuna's and Hyali's bankruptcy proceedings in October—again, in compliance with an order of the Court and while the case was still stayed— Plaintiffs made the Court aware of the potential successor liability claim.  ECF No. 31 at 1.  At that point, the Court set a status conference to discuss proceedings going forward.  Minute Order dated Oct. 28, 2021.  That conference was held in November, after which the Court entered an order setting a briefing schedule for the motion to amend, and Plaintiffs abided by it.  ECF Nos. 36–37.

Under these circumstances, permitting the motion to amend would not "'reward the indolent and cavalier.'"  *Lurie v. Mid-Atl. Permanente Med. Grp., P.C.*, 589 F. Supp. 2d 21, 23 (D.D.C. 2008) (quoting *Leary v. Daeschner*, 349 F.3d 888, 906 (6th Cir. 2003)).  Nor will Zeytuna be prejudiced if the Court were to consider the motion.  Discovery was ongoing when the case was stayed during the summer of 2021.  Although the amended discovery deadline of July 2, 2021, has passed, it is clear that, if this case continues, that deadline will have to be extended.  Therefore, the Court can discern no prejudice to Zeytuna.  *See Ijoor v. Consummate Computer Consultants Sys., LLC*, No. CV 15-1292, 2017 WL 9613962, at *1 (D.D.C. Sept. 8, 2017) (finding no prejudice

---

[23] To be sure, the automatic bankruptcy stay terminated as to both Hyali and Zeytuna during the summer of 2021.  But, in compliance with an order of the Court, Plaintiffs reported that information in October 2021, at which time they sought a further stay.  Minute Order dated June 1, 2021; ECF No. 30.  The Court did not officially lift the stay in this case until December 2021.  ECF No. 39.

where an extension of the discovery deadline was likely); *Ellis v. Georgetown Univ. Hosp.*, 631 F. Supp 2d 71, 80 (D.D.C. 2009) (finding no prejudice from granting a motion to amend where discovery could be reopened because summary judgment briefing had not yet commenced).

Plaintiffs have established good cause under Rule 16(b)(4), and delay is not an impediment to granting the motion for leave to amend.

### B.    Motion to Dismiss

Generally, "[w]hen a plaintiff amends [a] complaint, it renders a motion to dismiss that complaint moot," and a court therefore "need not reach the substance" of the motion to dismiss. *Gray*, 688 F. Supp. 2d at 6. Here, although the motion to dismiss portion of the combined motion to dismiss/opposition to the motion for leave to amend focuses largely on argument opposing the proposed amended complaint (ECF No. 40-1 at 5–6), it also asserts that Zeytuna has "no meaningful assets" (ECF No. 40-1 at 6). Plaintiffs interpret that as an argument that Zeytuna no longer has the capacity to sue, and that Zeytuna seeks dismissal of the original complaint on that basis. ECF No. 44 at 3.

The Court does not agree that the bald assertion that Zeytuna has no assets, without citation to legal authority, sufficiently raises the question of its capacity to be sued. Thus, any argument regarding such capacity has been forfeited. *See, e.g.*, *Yueh-Lan Wang ex rel. Winston Wen-Young Wong v. New Mighty U.S. Tr.*, 322 F.R.D. 11, 18 (D.D.C. 2017) ("'Generally, capacity is considered an affirmative defense, not a jurisdictional issue.'" (quoting *Davis v. Lifetime Capital, Inc.*, 560 F. App'x 477, 478 (6th Cir. 2014))); *Hendricks v. Office of Clermont Cty. Sheriff*, No. 1:03-CV-572, 2006 WL 2850515, at *3 (S.D. Ohio Sept. 29, 2006) ("Failure to raise lack of capacity in an appropriate pleading or amendment or by timely motion constitutes waiver of the

defense."). The motion to dismiss can therefore be denied as moot, and the Court does so on that basis.

Nonetheless, the Court will briefly address the issue of capacity. Even if Zeytuna is no longer a going concern and has no assets, it continues to have the capacity to sue and be sued. According to Rule 17, a corporation's capacity to be sued is determined "by the law under which it was organized." Fed. R. Civ. P. 17(b)(2). Zeytuna was formed under the laws of the District of Columbia. *See* ECF No. 1, ¶ 5 (alleging that Zeytuna is incorporated in the District of Columbia); ECF No. 9, ¶ 5 (admitting that allegation). Under District of Columbia law, even dissolved corporations can sue and be sued. *See Colon v. Ashby*, 314 F. Supp. 3d 116, 124 & n.2 (D.D.C. 2018) (stating that, pursuant to D.C. Code § 29-106.02, a corporation "remains a suable entity despite its administrative dissolution"); D.C. Code § 29-312.05(b)(5)–(6) (providing that voluntary dissolution of a corporation "shall not . . . [p]revent commencement of a proceeding by or against the corporation in its corporate name" or "[a]bate or suspend a proceeding pending by or against the corporation on the effective date of dissolution"); D.C. Code § 29-303.02 (providing that "[u]nless its articles of incorporation provide otherwise, every corporation shall have perpetual duration and succession in its corporate name and shall have the . . . power to . . . [s]ue and be sued," among other things).

For these reasons, even if its motion to dismiss were not moot, Zeytuna would have failed to meet its burden under Rule 12(b)(6) to show "that no legally cognizable claim for relief" is pleaded in the operative complaint. *Cohen v. Bd. of Trs. of the Univ. of D.C.*, 819 F.3d 476, 481 (D.C. Cir. 2016) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2015)). The motion is therefore denied.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiffs' motion for leave to amend the complaint (ECF No. 37) is **GRANTED**.  It is further

**ORDERED** that Defendant Zeytuna's motion to dismiss the original complaint (ECF No. 40) is **DENIED AS MOOT**.  It is further

**ORDERED** that Plaintiffs shall file their amended complaint on or before March 29, 2022.[24]  It is further

**ORDERED** that the parties shall meet and confer and file a joint status report on or before April 12, 2022, proposing a schedule for further proceedings.  That submission shall also address the parties' views as to what form of alternative dispute resolution the case is most suited to going forward.  Counsel are reminded that their options include private mediation, mediation with a magistrate judge or the Circuit Mediator's District Court Mediation Program, arbitration, early neutral evaluation, or any other form of alternative dispute resolution which can be tailored to the needs of this case.

**SO ORDERED.**

Date:  March 23, 2022

_____
G. Michael Harvey
United States Magistrate Judge

---

[24] Although this Court's local civil rules deem an amended complaint filed on the date that a motion for leave to amend is granted, *see* LCvR 7(i), it is the undersigned's practice to require an amended complaint to be filed as a separate document as a courtesy, in order to clarify the docket.

43